The 2416 Corporation, Plaintiff-Appellant, *v.* Chicago Transit Authority, Defendant and Counterplaintiff-Appellee.—(The First National Bank of Chicago, Trustee, Defendant and Counterdefendant-Appellant.)—Lois Beck, Plaintiff-Appellant, *v.* Chicago Transit Authority, Defendant and Counterplaintiff-Appellee.—(The First National Bank of Chicago, Trustee, Defendant and Counterdefendant-Appellant, Harris Trust and Savings Bank, Trustee, Intervening Petitioner.)

(No. 61093;

First District (5th Division)—January 24, 1975.

*Opinion modified upon denial of rehearing April 11, 1975.*

Leonard M. Ring, of Chicago, for plaintiff-appellant Lois Beck.

Jack S. Levin and Tefft W. Smith, of Chicago (Kirkland & Ellis, of counsel), for defendant-appellant The First National Bank of Chicago.

DeWolfe, DeWolfe & Markley, of Chicago (John C. DeWolfe, Jr., of counsel), for plaintiff-appellant The 2416 Corporation.

Ralph F. Huck and Richard A. Makarski, of Chicago (Chapman and Cutler, of counsel), for intervening petitioner-appellee Harris Trust & Savings Bank.

Foran, Wiss & Schultz, of Chicago (Robert E. Wiss, of counsel), for defendant-appellee Chicago Transit Authority.

Mr. JUSTICE SULLIVAN delivered the opinion of the court:

This is an appeal from an order construing certain provisions of a trust agreement.[1] The original action was brought by Lois Beck and the 2416 Corporation as revenue bondholders of the Chicago Transit Authority (CTA) against The First National Bank of Chicago as trustee (Trustee) and the CTA. The Trustee, in turn, because the CTA had failed to provide for interest fund payments on the revenue bonds due to insufficient revenue, sought a declaration that the Trustee had an unfettered right pursuant to the trust agreement to use the moneys accumulated in the modernization fund and the depreciation reserve fund to make payments to the interest fund as provided for in the trust agreement. The Harris Bank and Trust Co. (Harris), as equipment trustee, intervened, claiming that any use by the Trustee of the moneys in the modernization fund would deplete the assets available therein from which payments of the

---

[1] All five parties to this appeal jointly moved on November 8, 1974, for an expedited ruling before January 1, 1975, on this matter on account of its emergency nature. The CTA did not have sufficient money in its debt service accounts to provide for the payment of interest on its revenue bonds due January 1, 1975. It was stipulated by all parties that a default by the CTA on its debt obligation might have an adverse effect on the credit of the City of Chicago, State of Illinois and County of Cook. The public interest might be significantly affected further in that the recourse available to the bondholders should the trial court's order be affirmed was a suit to compel a CTA fare increase. In view thereof, we felt that the interests of the parties and the public would best be served by ruling on this matter before January 1, 1975. Accordingly, we accepted a briefing schedule where the briefs of all parties would be filed on or before December 13, 1974, and the matter was then set for oral argument on December 20, 1974. In the meantime, however, the CTA, consistent with its contentions herein, exercised its discretion so as to make available sufficient funds for the payment of the January interest due on the outstanding bonds and, as a result, the pre-January opinion was no longer necessary. Nevertheless, the basic problem remains and will rise again when the July 1, 1975, interest payments become due.

equipment trust certificates on the rolling stock of the CTA must also be made.

A declaratory judgment order was entered from which the bondholders and the Trustee appeal. The controversy concerns primarily paragraphs 2 and 3 of the order, which state:

"2. Moneys deposited by the CTA to the Modernization Fund from any source other than income or revenue as defined in the Trust Agreement, may only be disbursed from the Modernization Fund upon the written order of the CTA Board for one or more of the purposes specified in § 803 of the Trust Agreement. The CTA Board is vested with discretion as to the application of such moneys to the purposes specified in § 803 of the Trust Agreement. 3. The First National Bank of Chicago, as Trustee, has a claim of right under § 705 of the Trust Agreement to moneys in and hereafter deposited to the .Modernization Fund and the Depreciation Reserve Fund from income or revenue as defined in the Trust Agreement, whenever moneys in the Transit Revenue Fund may be insufficient to make the deposits specified [2] in sub-paragraphs (b) to (e), both inclusive, of § 703 and § 704 of the Trust Agreement, as amended."

In the original trust agreement, certain channels were established for the routing of all receipts of the CTA.[3] The basic distinction was made between income or revenue and receipts from other sources, *i.e.*, gifts, grants, loans, proceeds from insurance, recoveries for damages to property or from the liquidation, conversion or disposition of property, and proceeds from subway rentals pursuant to a franchise ordinance. Proceeds from the liquidation, conversion or disposition of any property or assets, or moneys received on account of any damage, loss or casualty was to be paid to the Trustee and by it deposited in the modernization fund. The income or revenue of the CTA was to be placed in the transit revenue fund.

From the transit revenue fund the Trustee was to apply amounts speci-

---

[2] The "deposits specified" are fixed deposits to various funds for debt service. See notes 4, 5, 6 and 7, *infra*.

[3] The trust agreement related to Series F 1947 Revenue Bonds. Subsequent revenue bonds were issued in the Series of 1952 and 1953, together with supplementary trust agreements incorporating the provisions of the 1947 trust agreement. However, for each series there are separate interest funds, serial bond material funds, sinking funds and revenue bond reserve funds. No priority is established between the different series (the 1947 agreement provided for a pro rata sharing with any subsequent series), so we treat them as one for the purposes of this opinion.

fied by written orders of the CTA Board into the CTA working cash account. Then, to the extent that moneys were available, the Trustee was to make withdrawals from the transit revenue fund of sums "sufficient to pay when due the next succeeeding semi-annual installment of interest" on outstanding bonds for deposit to the interest fund.[4] Thereafter, to the extent moneys were available, the Trustee was to transfer specified sums from the transit revenue fund into the serial bond maturity fund,[5] the sinking fund,[6] the revenue bond reserve fund,[7] the depreciation reserve fund,[8] the operating expense reserve fund,[9] the municipal compensation fund,[10] and finally, the Modernization Fund.[11] Whenever moneys in the transit revenue fund were insufficient to make the fixed deposit specified for those various funds, section 705 of article 7 provided that:

> "[T]he Trustee shall use any moneys then in the Modernization Fund, other than the proceeds of gifts, loans and grants, to make the deposits specified in said subparagraphs (b) to (e) both inclusive [of Section 703], and in the event sufficient moneys should not then be in the Modernization Fund to make the full amount of such deposits, the Trustee shall use any moneys then in the Municipal Compensation Fund, the Operating Expense Reserve Fund, and the Depreciation Reserve Fund to make the full amount of such deposits."[12]

Likewise, the preamble to section 803 of article 8 of the trust agreement states:

> "Disbursements of the moneys in the Modernization Fund shall be made or authorized by the Trustee at any time and from time to time upon the written order of the Board."

Subsection (6) provides:

> "[I]f and whenever moneys in the Transit Revenue Fund may be insufficient to make the deposits specified in paragraphs (b) to (e), both inclusive, of Section 703 and Section 704 of Article Seven, the Trustee shall use any moneys then in the Moderniza-

---

[4] Article 7, section 703(b).

[5] Article 7, section 703(c).

[6] Article 7, section 703(d).

[7] Article 7, section 703(e).

[8] Article 7, section 703(f).

[9] Article 7, section 703(g).

[10] Article 7, section 703(h).

[11] Article 7, section 703(i).

[12] The only accounts with funds available are the modernization fund and the depreciation reserve fund.

tion Fund other than the proceeds of gifts, loans and grants, to make up such deficiencies with priority in the order in said Section 703 expressed."

The CTA and Harris argue (1) that the right of the Trustee to invade the modernization fund pursuant to section 705 applies only to the income and revenue portion of the modernization fund and not to funds received from other sources;[13] and (2) that the preamble to section 803 is to be construed so as to require a written order of the CTA Board before the Trustee may use moneys in the modernization fund derived from "other sources" to make the specified section 705 payments. This second contention is predicated on the theory that the section 803 preamble, "Disbursements * * * shall be made * * * by the Trustee at any time and from time to time upon the written order of the Board," is to be read conjunctively. They argue that the use of the phrase "and from time to time" was meant to preclude any possible constructional ambiguity that the phrase "at any time" should mean only once.

■■ General rules for the construction of written instruments apply to the construction of trust instruments. (*Storkan v. Ziska*, 406 Ill. 259, 94 N.E.2d 185; I.L.P. *Trusts* § 81.) In construing a trust and in determining whether an ambiguity exists in a trust instrument, the instrument creating or declaring the trust must be considered as a whole. *Bear v. Millikin Trust Co.*, 336 Ill. 366, 168 N.E. 349; I.L.P. Trusts § 81.

We believe that section 705 and section 803(6) must be read together. Section 705 clearly gives the Trustee the sole right to invade the modernization fund to make the payments to the various sinking funds in the event insufficient revenue is generated. No written authorization of the Board is required by this section, nor does the CTA or Harris so contend. They do assert, however, that this provision allowing the Trustee to invade applies only to that portion of the modernization fund attributable to income or revenue. However, we are of the belief that there is no requirement in the modernization fund for a segregation of moneys derived from income or revenue and those derived from other sources except for the express exclusion of "proceeds of gifts, loans or grants" appearing in both sections. Article 7 is not limited in application to income or revenue only. The very title of article 7 relates to "receipts" of the transportation system—a term more generic than "income or revenue." The second half of section 701 of article 7 relates and pertains to the application and disposition of all nonincome funds. As stated above, section 705 itself

---

[13] The Trustee's right to invade the depreciation reserve fund is not disputed to the extent that, as a recipient of transit revenue fund money, that fund contains moneys derived from income or revenue of the CTA's operation. Such right would not extend to funds received from gifts or grants specifically earmarked as to their use.

only excludes from the Trustee's control the proceeds of gifts, loans or grants then in the modernization fund. These are nonincome items, and their exclusion would be superfluous under the CTA's interpretation of section 705's application. The historic principle is aptly stated, *"Inclusio unius est exclusio alterius."* [14]

The CTA and the Harris also point to section 703(i) of article 7. Section 703, in providing for the order of disbursements of the income or revenue deposited in the transit revenue fund, states:

> "In order to give effect to the provisions of Section 702 hereof, the trustee shall, from the funds received by it and set aside in or allocated to the Transit Revenue Fund, and in the following order of precedence
>
>         &#42;    &#42;    &#42;
>
> (i) Deposit *in trust* at least semi-annually, with such depositary as the Board may from time to time designate, funds not set aside in accordance with any of the paragraphs (a) to (h) above, in a separate fund designated as 'Modernization Fund' created by Section 802 hereof." (Emphasis added.)

They contend that the express provision in section 703(i) that these funds be deposited "in trust" was meant to segregate those moneys in the modernization fund. We disagree. Section 802, which creates the modernization fund, expressly provides for the inclusion of section 703(i) funds into that Fund,[15] but makes no provision for a segregation thereof into a separate trust fund. Furthermore, the above stated preamble to section 703 states that its purpose is to give effect to the provisions of section 702 which in turn provides in subsection (9) that any balance of income or revenue left over after the required deposits into the sundry accounts and funds was to be used "for deposit in the Modernization Fund, provided for in Section 802 hereof." We find no provision in the trust agreement for a separate trust of income and revenue proceeds within the modernization fund.

In any event, even assuming such a segregation was provided in the agreement, we believe that section 705 expressly states that "the Trustee shall use any moneys then in the Modernization Fund, other than the proceeds from gifts, loans and grants," to make the required deposits.

---

[14] The inclusion of one is the exclusion of another.

[15] Section 802 provides: "There shall be set aside and deposited in a separate fund designated 'Modernization Fund' in such depositary as the Board may from time to time designate the following:

        &#42;    &#42;    &#42;

(b) Funds provided to be so set aside by sub-paragraph (i) of Section 703 of Article Seven hereof."

Even though section 703(i) funds were deposited "in trust," as the CTA contends, there would still be moneys then in the modernization fund available for section 705 purposes.

Thus, we believe the proper interpretation of section 705 is one which gives the Trustee the right to use any moneys, whatever, their source, in the modernization fund, other than the proceeds of gifts, loans and grants, as well as all funds in the depreciation reserve fund from which to make the balance of payments due to the deficit funds as provided in section 705.

■■ In view thereof, it is our opinion that the trial court was in error holding in paragraph 3 of its order that the right of a Trustee to moneys in the modernization and depreciation reserve fund was limited to moneys derived from "income or revenue as defined in the Trust Agreement."

We believe also that the provision in the preamble to section 803, "at any time and from time to time," must be read disjunctively to give the Trustee the right to use at any time the moneys in the modernization fund, other than the proceeds of gifts, loans or grants, consistent with the provisions of section 705, and that no written order or other authorization of the CTA Board is necessary for the Trustee to use said moneys for section 705 purposes.

In view thereof, it is our opinion that the trial court was also in error in holding in paragraph 2 of its order, insofar as it applied to section 803(6), that moneys from the modernization fund "may be disbursed only on the written order of the CTA Board, for one or more of the purposes specified in § 803 of the Trust Agreement." Specifically, we hold that no written order of the CTA Board is required for section 803(6) withdrawals from the modernization fund.

It is noted also that other portions of the trial court's order are inconsistent with our holdings here; namely, paragraph 4, which limits usable funds by the Trustee to "moneys from income or revenue" and paragraph 5, which refers to moneys deposited in the Modernization and Depreciation Reserve Funds "which constitute income or revenue as defined in the Trust Agreement."

We conclude, therefore, that the holdings of the trial court in paragraphs 2 and 3 of its declaratory judgment order are reversed, and we remand this cause with directions that paragraphs 2, 3, 4 and 5 of the order be amended consistent with the content of this opinion.

Reversed in part.

Remanded with directions.

DRUCKER and LORENZ, JJ., concur.